Jeffrey L. Kessler (*pro hac vice* forthcoming)
JKessler@winston.com
Jonathan Amoona (*pro hac vice* forthcoming)
JAmoona@winston.com
Adam I. Dale (*pro hac vice* forthcoming)
AIDale@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone: 212-294-6700
Facsimile: 212-294-4700

Jeanifer Parsigian (SBN: 289001)
JParsigian@winston.com
WINSTON & STRAWN LLP
101 California Street, 34th Floor
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CAROLINE GUDEN, LUCIA BICKNELL, NATHAN LIETZKE, NIKOLAS STEMMET, EMILY MOLINS, EMILY BRIEANT, HALEY KOO, and EVAN KAI RAYLE,<br><br>Plaintiffs,<br><br>v.<br><br>THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY a.k.a. STANFORD UNIVERSITY,<br><br>Defendant. | **Case No. 5:21-cv-3559**<br><br>**COMPLAINT FOR FRAUD/INTENTIONAL MISREPRESENTATION, FRAUDULENT CONCEALMENT, FRAUDULENT INDUCEMENT, NEGLIGENT MISREPRESENTATION, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, AND VIOLATION OF CALIFORNIA UCL**<br><br>**JURY TRIAL DEMANDED** |

1        Plaintiffs Caroline Guden, Lucia Bicknell, Nathan Lietzke, Nikolas Stemmet, Emily Molins,

2  Emily Brieant, Haley Koo, and Evan Kai Rayle (each, a "Plaintiff" and collectively, the "Plaintiffs"),

3  by their undersigned counsel, allege, upon knowledge as to themselves and their own acts and on

4  information and belief as to all other matters, against Defendant the Board of Trustees of the Leland

5  Stanford Junior University, a.k.a. Stanford University ("Stanford" or the "University") as follows:

## I.    INTRODUCTION

7       1.     On July 8, 2020, 240 Stanford student athletes from eleven Varsity sports were

8  unceremoniously informed—via a Zoom call with approximately thirty-minutes' notice—that their

9  collegiate athletic careers had been cancelled.  Before July 8, no one at Stanford—including the

10  administration, the Department of Athletics or any of Plaintiffs' coaches—ever stated or even

11  suggested that cancelling Varsity teams was even a possibility.  To the contrary, Plaintiffs and their

12  families had been affirmatively misled and thus were left in complete shock following the July 8

13  announcement.

14       2.     It was only in the following weeks and months that Plaintiffs—members of the Field

15  Hockey, Women's Squash, Men's Volleyball, Wrestling, Women's Lightweight Rowing,

16  Synchronized Swimming, Women's Fencing, and Men's Fencing teams (collectively, the "Eliminated

17  Programs")—learned that Stanford had long planned to cut some of its Varsity sports programs and

18  had lured Plaintiffs to enroll and remain at the University with the promise of high-quality Varsity

19  programs at a time when the University knew it would soon be eliminating numerous sports.

20       3.     Rather than be transparent and share this critical information with Plaintiffs as they

21  made one of the most important decisions of their young lives—where to attend college—Stanford

22  intentionally hid the ball.  Indeed, Stanford has now admitted in a December 16, 2020 letter attached

23  as Exhibit A, that it spent years developing plans to reduce its Varsity sports programs, but concealed

24  and intentionally misrepresented that fact because the University concluded that sharing it would have

25  "trigger[ed] extreme uncertainty and, likely, animosity that would lead to an exodus of student-

26  athletes, coaches, and recruits across many sports (not just the [Eliminated Programs]), with lasting,

27  damaging effect."

28

4.      In other words, Stanford, one of the wealthiest universities in the world, surreptitiously withheld and misrepresented its plans to eliminate Varsity teams because it knew that doing so would have caused student athletes, including Plaintiffs, to make different decisions about where to attend college.  This was a betrayal of Plaintiffs, who would have made different choices about either enrolling or remaining at Stanford if they had known that Stanford was developing plans that would deprive them of the once-in-a-lifetime experience of being Varsity athletes for the duration of their college careers.

5.      Stanford claimed that its decision to eliminate these programs, and purportedly save $8 million per year, was necessary because the University—with its nearly $29 billion general endowment, and a separate athletic-specific endowment of at least $570 million—could no longer afford to support the teams.  But, to date, the University has repeatedly rebuffed proposals that would make the programs entirely self-funding and thereby remove any purported financial burden on the University.

6.      Faced with the imminent threat of irreparable harm through the destruction of a key component of their decision to attend Stanford, Plaintiffs seek redress for Stanford's violations of California tort, contract and unfair competition laws.  Specifically, Plaintiffs seek a preliminary and permanent injunction to maintain the status quo so that the Eliminated Programs are continued for at least the duration of each Plaintiff's enrollment at Stanford or the duration of his or her athletic eligibility.  This result is required so that Stanford fulfills its legal obligations to Plaintiffs who were so egregiously misled.

7.      Plaintiffs' collegiate athletic careers are limited in time by both the nature of collegiate enrollment and NCAA (or similar) eligibility rules.  If their respective Eliminated Programs are discontinued, Plaintiffs will lose, among other things, the irreplaceable opportunity to practice and play with their teammates and coaches and all of the once-in-a-lifetime experiences that participation on a Varsity team provides.  They will also suffer irreparable damage to their athletic skills, which can only be maintained through active competition, and the loss of competitive opportunities to achieve personal and team milestones that can never be recaptured.  This Court should grant Plaintiffs' request for injunctive relief so that Plaintiffs can fulfill their collegiate dreams as Varsity athletes in

accordance with the representations that Stanford made to them.  Justice and equity require nothing less.

## II.   PARTIES

**A.   Plaintiff Caroline Guden – Field Hockey**

8.      Plaintiff Caroline Guden is a Freshman member of Stanford's Varsity Field Hockey team.

9.      Ms. Guden is a citizen of Massachusetts.

10.      Having recently completed her Freshman season, Ms. Guden has at least four years of athletic eligibility remaining. [1]

11.      Ms. Guden aspires to qualify for the United States National and Olympic Field Hockey teams.  In order to have a meaningful chance of earning a position on these teams, Ms. Guden needs the coaching, training, competition and facilities of high-level Division I field hockey.

12.      In high school, Ms. Guden was the Independent School League field hockey player of the year and one of the top field hockey players in the Northeast.

13.      As a result of these achievements, Ms. Guden received numerous NCAA Division I Varsity field hockey scholarship offers, including from Boston College, Providence College, Stanford and the University of New Hampshire.  Ms. Guden was also heavily recruited by Harvard University.

14.      In late 2018 and early 2019—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Field Hockey—Ms. Guden was heavily recruited by Stanford's Field Hockey coaches to join the program.

15.      In January 2019, Ms. Guden accepted a partial athletic scholarship from Stanford because of the opportunity to study at a challenging academic institution and play on the Varsity Field Hockey team, which has historically been one of the top teams in the country.

16.      When Stanford reviewed and approved Ms. Guden's application for admission to the University, Stanford was aware that a key reason that Ms. Guden applied for admission (and eventually

---

[1] Due to the COVID-19 pandemic, certain NCAA athletes, including Ms. Guden, have been granted an additional year of athletic eligibility by the NCAA.

1    enrolled at Stanford) was because she understood she would have the opportunity to be a member of

2    the Varsity Field Hockey program for the duration of her enrollment at Stanford and/or the duration

3    of her athletic eligibility.

4         17.    No one at Stanford—including the administration, the Athletics Department or Ms.

5    Guden's coaches—ever stated or even suggested during her recruitment, or at any time after she

6    committed to Stanford, that cancelling the Field Hockey team was a possibility.

7         18.    To the contrary, Ms. Guden selected Stanford over other universities in substantial part

8    because she was informed by the University's Field Hockey Coach, Tara Danielson, that she would

9    have the opportunity to increase the amount of her scholarship based on her athletic performance.

10        19.    Had Ms. Guden known that Stanford was considering the elimination of the Varsity

11   Field Hockey team, she would have chosen to attend another university.

12        20.    In April 2021, Ms. Guden was named to the America East Conference All-Rookie

13   Team.

14        21.    The Stanford Field Hockey team has won the America East Conference Championship

15   in four out of the last five seasons, including the current 2020-21 season.  The Field Hockey team

16   recently competed in the NCAA Field Hockey Championship for the eleventh time in the last fourteen

17   seasons, reaching the Quarterfinals for the first time in program history.

18        22.    Ms. Guden and fifteen of her Field Hockey teammates were recently named to the 2020

19   National Field Hockey Coaches Association ("NFHCA") National Academic Team, and in March

20   2021, the Field Hockey team received the NFHCA Division I National Academic Team Award.  The

21   program's 3.83 grade-point average was the second highest in the nation, trailing Virginia

22   Commonwealth University by .01 points.

23        23.    Upon information and belief, the annual budget for Field Hockey is $1.6 million.

24        24.    Upon information and belief, following the announcement that the Field Hockey

25   program would be eliminated, the team raised $4.5 million in pledges to support the program on a

26   going-forward basis.  Despite these efforts, Stanford maintained its refusal to continue the team

27   beyond the current academic year.

28

**B.**     <u>**Plaintiff Lucia Bicknell – Women's Squash**</u>

25.     Plaintiff Lucia Bicknell is a Freshman member of Stanford's Varsity Women's Squash team.

26.     Ms. Bicknell is a citizen of Vancouver, British Columbia, Canada.

27.     With the 2020-21 Squash season cancelled due to COVID-19, Ms. Bicknell has at least four years of athletic eligibility remaining.

28.     In high school, Ms. Bicknell was a Canadian Squash National Champion, a Canadian National Runner-Up, and the 2019 Women's Individual Squash Champion at the Canada Winter Games.

29.     As a result of these achievements, Ms. Bicknell was recruited by several universities to participate on their Varsity squash teams, including Columbia University, Princeton University, Stanford and the University of Pennsylvania.

30.     In or around late 2018 and early 2019—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Women's Squash— Ms. Bicknell was heavily recruited by Stanford's Women's Squash coaches to join the program.

31.     In May 2019, Ms. Bicknell accepted a partial athletic scholarship from Stanford because of its unparalleled combination of academics and the ability to play on the Varsity Women's Squash team, which has historically been one of the top teams in the country.

32.     When Stanford reviewed and approved Ms. Bicknell's application for admission to the University, Stanford was aware that a key reason that Ms. Bicknell applied for admission (and eventually enrolled at Stanford) was because she understood she would have the opportunity to be a member of the Varsity Women's Squash program for the duration of her enrollment at Stanford and/or the duration of her athletic eligibility.

33.     No one at Stanford—including the administration, the Athletics Department or Ms. Bicknell's coaches—ever stated or even suggested during her recruitment, or at any time after she committed to Stanford, that cancelling the Women's Squash team was a possibility.

34.     Had Ms. Bicknell known that Stanford was considering the elimination of the Varsity Women's Squash team, she would have chosen to attend another university.

35.     Stanford's Women's Squash team has placed in the top ten in each of the last five National Championships it participated in.

36.     Upon information and belief, the annual budget for Women's Squash is approximately $70,000.

37.     Upon information and belief, prior to being cut, Women's Squash had an existing endowment of $5.5 million.  Despite this endowment, which is more than sufficient to make the program permanently self-funding, Stanford has refused to continue the team beyond the current academic year.

**C.**     **Plaintiff Nathan Lietzke – Men's Volleyball**

38.     Plaintiff Nathan Lietzke is a Sophomore starting setter on Stanford's Varsity Men's Volleyball team.

39.     Mr. Lietzke is a citizen of Texas.

40.     Having recently completed his Sophomore season, Mr. Lietzke has at least three years of athletic eligibility remaining.

41.     Mr. Lietzke is a member of the United States Collegiate Volleyball National Team and aspires to qualify for the United States National and Olympic Volleyball teams.  In order to have a meaningful chance of earning a position on these teams, Mr. Lietzke needs the coaching, training, competition and facilities of high-level Division I volleyball.

42.     In high school, Mr. Lietzke was a member of the United States Youth Volleyball National Training Team, which is comprised of the top young volleyball players in the country, and was ranked as the number four men's volleyball recruit in the nation.

43.     As a result of these achievements, Mr. Lietzke received numerous NCAA Division I Varsity men's volleyball scholarship offers, including from UCLA, Ohio State University, Stanford and Pepperdine University.  Mr. Lietzke was also heavily recruited by Princeton University.

44.     In 2018—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Men's Volleyball—Mr. Lietzke was heavily recruited by Stanford's Men's Volleyball coaches to join the program.

45.     In late October 2018, Mr. Lietzke accepted a partial athletic scholarship from Stanford because it provided him the opportunity to pursue a degree from a prestigious academic institution and play on one of the best men's volleyball teams in the country, which has produced numerous Olympians.

46.     When Stanford reviewed and approved Mr. Lietzke's application for admission to the University and allowed Mr. Lietzke to enroll at the University, Stanford was aware that a key reason that Mr. Lietzke did so was because he understood he would have the opportunity to be a member of the Varsity Men's Volleyball program for the duration of his enrollment at Stanford and/or the duration of his athletic eligibility.

47.     No one at Stanford—including the administration, the Athletics Department or Mr. Lietzke's coaches—ever stated or even suggested during his recruitment, or at any time after he committed to Stanford, that cancelling the Men's Volleyball team was a possibility.

48.     To the contrary, while participating in a recruiting visit at Stanford in early October 2018, Stanford's Director of Athletics, Bernard Muir, told Mr. Lietzke and other recruits that if they chose Stanford it would be "the best four years of [their] lives."

49.     Had Mr. Lietzke known that Stanford was considering the elimination of the Varsity Men's Volleyball team, he would have chosen to attend another university.

50.     Mr. Lietzke was recently named to the All-Mountain Pacific Sports Federation Freshman Team, which was the 106th All-Conference selection in the Men's Volleyball team's history.

51.     The program successfully recruits many of the top men's volleyball players in the country and has been nationally ranked in the American Volleyball Coaches Association ("AVCA") preseason poll in fourteen consecutive seasons.

52.     In 2020, the team earned the AVCA Team Academic Award, boasting one of the top seven grade-point averages in the nation.

53.     Upon information and belief, the annual budget for the Men's Volleyball team is approximately $700,000.

54.     Upon information and belief, prior to being cut, the Men's Volleyball team had an existing endowment of $400,000.  Following the announcement that the Men's Volleyball program would be eliminated, the team raised an additional $7.7 million in pledges.  Despite these efforts, Stanford maintained its refusal to continue the team beyond the current academic year.

**D.     <u>Plaintiff Nikolas Stemmet – Wrestling</u>**

55.     Plaintiff Nikolas Stemmet is a Freshman member of Stanford's Varsity Wrestling team.

56.     Mr. Stemmet is a citizen of Illinois.

57.     Having recently completed his Freshman season, Mr. Stemmet has at least four years of athletic eligibility remaining.

58.     In high school, Mr. Stemmet was a State Champion, National Champion and an All-American wrestler.

59.     As a result of these achievements, Mr. Stemmet received numerous NCAA Division I Varsity wrestling scholarship offers, including from Indiana University, Stanford and Arizona State University.  Mr. Stemmet was also heavily recruited by Harvard University.

60.     In 2019—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Wrestling—Mr. Stemmet was heavily recruited by Stanford's Wrestling coaches to join the program.

61.     In September 2019, Mr. Stemmet accepted a partial wrestling scholarship to attend Stanford because it provided him with the best opportunity to further his academic and athletic goals, with the University boasting one of the top Varsity wrestling programs in the country.

62.     When Stanford reviewed and approved Mr. Stemmet's application for admission to the University, Stanford was aware that a key reason that Mr. Stemmet applied for admission (and eventually enrolled at Stanford) was because he understood he would have the opportunity to be a member of the Varsity Wrestling program for the duration of his enrollment at Stanford and/or the duration of his athletic eligibility.

63.     No one at Stanford—including administration, the Athletics Department or Mr. Stemmet's coaches—ever stated or even suggested during his recruitment, or at any time after he committed to Stanford, that cancelling the Wrestling team was a possibility.

64.     To the contrary, Mr. Stemmet selected Stanford in substantial part because he was informed by the University's Assistant Wrestling Coach, Ray Blake, that he would have the opportunity to increase the amount of his scholarship for his junior and senior years based on his wrestling performance during his freshman and sophomore years.  This was critical to Mr. Stemmet because the scholarship offered to Mr. Stemmet by Stanford did not provide for any scholarship award during his junior or senior years.

65.     Mr. Stemmet also chose to attend Stanford based on the University's commitment to him.  As Coach Blake advised Mr. Stemmet during his recruitment:  Stanford "would love nothing more than to have [him] repping the [Stanford] Cardinal over the next 4-5 years."

66.     Had Mr. Stemmet known that Stanford was considering the elimination of the Varsity Wrestling team, he would have chosen to attend another university.

67.     In March 2021, seven members of the Wrestling team, including Mr. Stemmet, qualified for, and participated in, the NCAA Championships.  Mr. Stemmet's teammate, Shane Griffith, was crowned the NCAA Champion, the second Stanford wrestler to accomplish this feat in seventeen years.

68.     In its history, the Wrestling team has produced twenty-three All-Americans.

69.     Upon information and belief, the annual budget for Wrestling is approximately $1 million.

70.     Upon information and belief, prior to being cut, Wrestling had an existing endowment of $700,000.  Following the announcement that the Wrestling program would be eliminated, the team raised an additional $11.7 million in pledges.  Despite these efforts, Stanford maintained its refusal to continue the team beyond the current academic year.

**E.     Plaintiff Emily Molins – Women's Lightweight Rowing**

71.     Plaintiff Emily Molins is a rising-Junior member of Stanford's Varsity Women's Lightweight Rowing team.

72.     Ms. Molins is a citizen of Illinois.

73.     Ms. Molins has at least three years of athletic eligibility remaining.

74.     Ms. Molins was a member of the United States "Under 23" National Rowing Team and aspires to qualify for the United States Lightweight Rowing National and Olympic teams.  In order to have a meaningful chance of earning a position on the Olympic and National teams, Ms. Molins needs the coaching, training, competition and facilities of high-level collegiate rowing.

75.     In high school, Ms. Molins was a bronze medalist in the Scholastic Rowing Association of America National Championship.

76.     As a result of her athletic achievements, Ms. Molins was recruited by several universities to participate on their Varsity rowing teams, including Princeton University, Stanford and MIT.

77.     In 2017—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Women's Lightweight Rowing—Ms. Molins was heavily recruited by Stanford's Women's Lightweight Rowing coaches to join the program.

78.     In August 2017, Ms. Molins committed to Stanford because of the University's academic and athletic excellence, and in particular, because at the time, the Rowing team had won six of the past seven National Championships and was widely regarded as the top program in the nation.

79.     When Stanford reviewed and approved Ms. Molins' application for admission to the University and allowed Ms. Molins to enroll at the University, Stanford was aware that a key reason that Ms. Molins did so was because she understood she would have the opportunity to be a member of the Varsity Women's Lightweight Rowing program for the duration of her enrollment at Stanford and/or the duration of her athletic eligibility.

80.     No one at Stanford—including the administration, the Athletics Department or Ms. Molins' coaches—ever stated or even suggested during her recruitment, or at any time after she committed to Stanford, that cancelling the Women's Lightweight Rowing team was a possibility.

81.     Had Ms. Molins known that Stanford was considering the elimination of the Varsity Lightweight Rowing team, she would have chosen to attend another university.

82.     At Stanford, Ms. Molins has been crowned Intercollegiate Rowing Association Champion in the "Varsity Eight" division.  She has also won the Western Intercollegiate Rowing Association Championship.

83.    The Women's Lightweight Rowing team has won five consecutive Intercollegiate Rowing Association Championships.

84.    Over the past three seasons, the team has earned three Collegiate Rowing Coaches Association All-American awards, for a total of nine awards during that period.

85.    After their 2020 season was cancelled due to the COVID-19 pandemic, the team organized a virtual event, which raised $1,500 for Feeding America.

86.    Upon information and belief, the annual budget for Women's Lightweight Rowing is $160,000.  Stanford has refused to continue the team beyond the current academic year.

**F.    Plaintiff Emily Brieant – Synchronized Swimming**

87.    Plaintiff Emily Brieant is a Sophomore member of Stanford's Varsity Synchronized Swimming team.

88.    Ms. Brieant is a citizen of New York.

89.    Having recently completed her Sophomore season, Ms. Brieant has at least two years of athletic eligibility remaining.

90.    Ms. Brieant aspires to qualify for the United States National and Olympic teams.  In order to have a meaningful chance of earning a position on the Olympic and National teams, Ms. Brieant needs the coaching, training, competition and facilities of high-level collegiate synchronized swimming.

91.    In high school, Ms. Brieant's synchronized swimming club placed third at the United States Synchronized Swimming Junior National Championships, and she was a silver medalist at the 2018 United States Junior Olympics.

92.    In 2018—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Synchronized Swimming—Ms. Brieant was heavily recruited by Stanford's Synchronized Swimming coaches to join the program.

93.    In December 2018, Ms. Brieant committed to Stanford because of the University's academic and athletic excellence and Ms. Brieant's ability to participate on the Varsity Synchronized Swimming team, which is widely regarded as one of the top programs in the country.

94.     When Stanford reviewed and approved Ms. Brieant's application for admission to the University and allowed Ms. Brieant to enroll at the University, Stanford was aware that a key reason that Ms. Brieant did so was because she understood she would have the opportunity to be a member of the Varsity Synchronized Swimming program for the duration of her enrollment at Stanford and/or the duration of her athletic eligibility.

95.     No one at Stanford—including the administration, the Athletics Department or Ms. Brieant's coaches—ever stated or even suggested during her recruitment, or at any time after she committed to Stanford, that cancelling the Synchronized Swimming team was a possibility.

96.     Ms. Brieant would not have applied to Stanford if the University did not have a Varsity synchronized swimming team and did not recruit her to be a part of that team.

97.     In 2021, Stanford's Synchronized Swimming team won its ninth National Championship in program history.

98.     The team has produced eight Olympians, including a gold medal winner and two bronze medal winners.

99.     Upon information and belief, the annual budget for Synchronized Swimming is approximately $200,000.  Stanford has refused to continue the team beyond the current academic year.

### G.     **Plaintiff Haley Koo – Women's Fencing**

100.     Plaintiff Haley Koo is a Freshman who participates in the Foil competition for Stanford's Varsity Women's Fencing team.

101.     Ms. Koo is a citizen of New Jersey.

102.     Having recently completed her Freshman season, Ms. Koo has at least four years of athletic eligibility remaining.

103.     In high school, Ms. Koo was a First-Team All-State Fencer, a bronze medalist at the 2018 Pan American Games, and one of the top female fencers in the nation for her age group.

104.     As a result of these achievements, Ms. Koo was recruited by several universities to participate on their Varsity fencing teams, including Northwestern University, Cornell University, Stanford, Notre Dame University, Duke University, and Brown University.

105.   In or around late 2018 and early 2019—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Women's Fencing—Ms. Koo was heavily recruited by Stanford's Fencing coaches to join the program.

106.   Ms. Koo committed to Stanford in June 2019 because of the University's outstanding academics and athletics programs, and in particular, the Varsity Women's Fencing team, which is regarded as the top program on the west coast.

107.   When Stanford reviewed and approved Ms. Koo's application for admission to the University, Stanford was aware that a key reason that Ms. Koo applied for admission (and eventually enrolled at Stanford) was because she understood she would have the opportunity to be a member of the Varsity Women's Fencing program for the duration of her enrollment at Stanford and/or the duration of her athletic eligibility.

108.   No one at Stanford—including the administration, the Athletics Department or Ms. Koo's coaches—ever stated or even suggested during her recruitment, or at any time after she committed to Stanford, that cancelling the Women's Fencing team was a possibility.

109.   Had Ms. Koo known that Stanford was considering the elimination of the Varsity Women's Fencing team, she would have chosen to attend another university.

110.   Ms. Koo completed her Freshman season on Stanford's Varsity Women's Fencing team with an overall record of 28-8 and was the top women's foil placer at the Western Invitational.

111.   In March 2021, Ms. Koo was crowned an All-American at the National College Fencing Championships.  All four freshmen on Stanford's Fencing team, including Ms. Koo, were named All-Americans.

112.   In its history, Stanford's Fencing program has produced seven Olympians and nine National Champions.

113.   Upon information and belief, the annual budget for Fencing for both the men's and women's rosters, which largely operate as a single team, is approximately $225,000.

114.   Upon information and belief, before the cuts, Fencing was almost entirely self-funded, boasting a $3 million endowment.  Despite this endowment, Stanford has refused to continue the team beyond the current academic year.

**H.**     **Plaintiff Evan Kai Rayle – Men's Fencing**

115.     Plaintiff Evan Kai Rayle is an incoming Freshman on Stanford's Varsity Men's Fencing team.

116.     Mr. Rayle is a citizen of Oregon.

117.     Mr. Rayle has at least four years of athletic eligibility remaining.

118.     In high school, Mr. Rayle was ranked top ten in the nation for fencing in the "Under 16" age group category and top twenty in the nation in the "Under 19" age group category.

119.     As a result of these achievements, Mr. Rayle was in recruiting discussions with Duke University, Stanford and the University of North Carolina-Chapel Hill.

120.     In or around late 2018 and early 2019—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Men's Fencing—Mr. Rayle was heavily recruited by Stanford's Fencing coaches to join the program.

121.     Mr. Rayle committed to Stanford in July 2019 because he believed that it provided the perfect combination of academics and athletics, including the opportunity to compete for one of the top fencing programs on the west coast.

122.     When Stanford reviewed and approved Mr. Rayle's application to enroll at the University, Stanford was aware that a key reason that Mr. Rayle applied for admission was because he understood he would have the opportunity to be a member of the Varsity Men's Fencing program for the duration of his enrollment at Stanford and/or the duration of his athletic eligibility.

123.     No one at Stanford—including the administration, the Athletics Department or Mr. Rayle's coaches—ever stated or even suggested during his recruitment, or at any time after he committed to Stanford, that cancelling the Men's Fencing team was a possibility.

124.     Had Mr. Rayle known that Stanford was considering the elimination of the Varsity Men's Fencing team, he would have chosen to attend another university.

125.     Two members of the Men's Fencing team qualified for, and competed in, the National Collegiate Championships in 2021.

126.     In its history, Stanford's Fencing program has produced seven Olympians and nine National Champions.

127. Upon information and belief, the annual budget for Fencing for both the men's and women's rosters, which largely operate as a single team, is approximately $225,000.

128. Upon information and belief, before the cuts, Fencing was almost entirely self-funded, boasting a $3 million endowment. Despite this endowment, Stanford has refused to continue the team beyond the current academic year.

## I.     Defendant Stanford

129. Defendant Stanford is a private university located in Santa Clara County, California, authorized to exercise corporate powers and privileges by the State of California.

130. Stanford is a citizen of California.

131. Upon information and belief, Stanford has an endowment of $28.9 billion, 4.9 percent of which is spent on University operations each year.

132. In addition to its multi-billion-dollar general University endowment, Stanford has a standalone, nine-figure endowment designated specifically for athletics.

133. Upon information and belief, as of 2016, the athletic-specific endowment was valued at $570 million.

134. According to the most recent Stanford Athletics Annual Report available, the Athletics Department generated $34.7 million in revenue from its athletic-specific endowment during the 2018-19 academic year.

135. Stanford has publicly stated that by eliminating the eleven cut sports, the University will save a total of $8 million per year, or approximately $727,000 per team.

136. According to its most recently filed Internal Revenue Service Form 990, Stanford President Marc Tessier-Lavigne earned approximately $1.2 million in reportable compensation and approximately $430,000 in other compensation from Stanford during the University's 2018 fiscal year.

137. According to the same document, Stanford's Head Football Coach, David Shaw, earned approximately $4.5 million in reportable compensation and approximately $305,000 in other compensation during the University's 2018 fiscal year.

138. Upon information and belief, Stanford does not publicly disclose the individual compensation of the University's other Athletics Department employees, including the compensation

1    for Athletics Director Muir.   However, public information indicates that Athletics Director

2    compensation for other members of Stanford's NCAA athletic conference (the Pac-12) is between

3    $700,000 and $1.2 million annually, including bonuses.  Upon information and belief, Mr. Muir's

4    annual compensation is at or above the top end of that range.

5         139.    Upon information and belief, the Stanford Athletics Department spent $71.6 million

6    dollars on Athletics Department employee compensation and benefits in fiscal year 2020, an

7    approximately 84 percent increase from the $38.8 million spent on Athletics Department employee

8    compensation and benefits in fiscal year 2012.

9                        **III.    JURISDICTION AND VENUE**

10        140.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332.

11        141.    Plaintiffs are citizens of Canada, Illinois, Massachusetts, New Jersey, New York,

12   Oregon and Texas.

13        142.    Stanford is a citizen of the state of California.

14        143.    The amount in controversy in this action with respect to each Plaintiff substantially

15   exceeds $75,000, exclusive of interest and costs, because Stanford's cost to continue each of the

16   Eliminated Programs for the duration of the respective Plaintiff's enrollment at Stanford and/or the

17   duration of his or her athletic eligibility significantly exceeds $75,000 per program.

18        144.    In the alternative, the amount in controversy in this action with respect to each Plaintiff

19   individually substantially exceeds $75,000, exclusive of interest and costs, because (a) each Plaintiff's

20   individual monetary damages if his or her team is eliminated will exceed $75,000; and (b) each

21   Plaintiff is individually entitled to punitive damages in excess of $75,000 as a result of Stanford's

22   oppressive, fraudulent and malicious conduct alleged herein.

23        145.    This Court has personal jurisdiction over Stanford because Stanford's principal place

24   of business is located in this District.

25        146.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial

26   part of the events or omissions giving rise to the claims herein occurred in this District and because

27   Stanford is an institution domiciled and doing business in this District.

28

## IV.   INTRADISTRICT ASSIGNMENT

147.   Assignment to the San Jose Division is proper.  This action arises in substantial part out of events that occurred in Santa Clara County where Stanford is located.

## V.   FACTUAL BACKGROUND

### A.   Stanford Suddenly Announces the Cancellation of Eleven Varsity Programs.

148.   On July 8, 2020, 240 Stanford student athletes from eleven Varsity sports received an ominous email from the University's Athletics Department inviting them to a Zoom call approximately thirty minutes later.

149.   During the call, which lasted less than ten minutes, Athletics Director Muir, an authorized agent of Stanford, informed the student athletes that their Varsity athletics programs would be cancelled following the 2020-21 academic year.

150.   While the student athletes, whose lives had suddenly been upended, were not given an opportunity to ask Mr. Muir any questions until days later, within hours of the announcement, Mr. Muir participated in a press conference with the media about the cuts.

151.   The reasons given for the cuts were vague, but during his brief Zoom call with the student athletes, Mr. Muir referred to "budgetary pressures" and other financial considerations.

152.   Further, on July 8, 2020 Stanford published an open letter on its website announcing the cuts to the broader Stanford community, which was authored by Stanford's authorized agents, President Tessier-Lavigne, Provost Persis Drell, and Athletics Director Muir.  The Open Letter is attached as Exhibit B.  The Open Letter stated that the decision "[came] down primarily to finances and competitive excellence.  With so many varsity sports and limited financial resources, [Stanford] would no longer be able to support a world-class athletics experience for [its] student-athletes without making these changes."

153.   The Open Letter contained an embedded link to an "FAQ" document that was simultaneously published on Stanford's website.  The FAQ document is attached as Exhibit C.  The FAQ did not identify an author, but upon information and belief, it was approved for publication by Messrs. Tessier-Lavigne, Drell and Muir.

154.    The FAQ stated that collectively, the eleven eliminated sports would save the University a total of $8 million per year, or approximately $727,000 per eliminated team.

155.    According to Stanford's approved Budget Plan for 2019-20, the University's athletic budget for that year was $149 million.

156.    Upon information and belief, Stanford's general endowment is almost $29 billion and its separate athletic endowment is at least $570 million.

157.    Based on this University-provided data, the cancellation of eleven sports resulted in the elimination of 28 percent of Stanford's Varsity student athletes, while reducing Stanford's athletics budget by approximately 5 percent.

**B.**    **Stanford Refuses to Entertain Proposals to Continue the Eliminated Programs with Self-Funding.**

158.    In light of Stanford's stated rationale that the cancellation of the Varsity teams was financially motivated, the eleven discontinued programs quickly mobilized to secure funding in order to become fully self-sustaining.  Within weeks, and without any support from the University, the eleven teams secured approximately $40 million in pledges, which would bring the total endowment for the eliminated sports to nearly $54 million.

159.    Despite this unprecedented fundraising effort to save the eleven cancelled programs, Stanford refused to agree to continue any of the teams.  Instead, the University stood by its statement in the FAQ that "[t]he decisions to reduce [its] sports offerings are final." *Id*.

160.    Further efforts to save the teams have been made by Stanford alumni, who created a group called "36 Sports Strong," representing all thirty-six Varsity athletic programs at the University. 36 Sports Strong has advocated for the continuation of the eleven cancelled programs and has developed a comprehensive plan for each of the eliminated programs to fully self-endow within five years.

161.    Representatives of 36 Sports Strong met with University officials on at least three occasions to discuss the group's self-endowment proposal:  first on December 30, 2020 with the Stanford Board of Trustees; again on February 9, 2021 with Provost Drell; and most recently, on April 13, 2021 with President Tessier-Lavigne.

162.   During these meetings, Stanford refused to explain why 36 Sports Strong's self-endowment proposal would not address Stanford's stated financial reasons for eliminating the eleven teams.

**C.   For Years, Stanford Has Been Surreptitiously Planning to Eliminate a Number of Its Varsity Teams.**

163.   Stanford's plan to eliminate numerous Varsity programs was developed in secrecy for as many as four years prior to its cancellation of the teams.

164.   On or around July 8, 2020, Stanford's Executive Associate Athletics Director Heather Owen, an authorized agent of the University, told the Field Hockey team that the decision to eliminate Varsity programs "had been in the making for several years."

165.   On March 10, 2021, Executive Associate Athletics Director and Chief Financial Officer Brian Talbott, an authorized agent of the University, stated to Ms. Koo's parents that a five-person executive team (which included Mr. Talbott) had been discussing the financial challenges facing the University and how to deal with them, including the possibility of cutting varsity programs, for as many as four years prior to Stanford's July 8, 2020 announcement.

166.   Stanford's Open Letter and FAQ document reaffirmed that the University undertook a years-long process.  For example, the documents note that the decision to eliminate sports came after "deliberative and detailed discussions for several years" and that the selection of which programs to eliminate was "decided upon after a comprehensive evaluation."

167.   On or around July 13, 2020, Athletics Director Muir told members of the Women's Lightweight Rowing team that the decision "certainly took some time and effort," that the University had "projected in the last few years [that it] would have a structural deficit" that would need to be addressed, and that Stanford had been considering discontinuing numerous Varsity sports "for quite some time."

168.   In a December 16, 2020 letter from Stanford President Tessier-Lavigne, Provost Drell and Athletics Director Muir to representatives of 36 Sports Strong, the University stated that the decision was reached "[a]fter extensive analysis and deliberations involving Athletics leaders, senior

University leaders, the entire Board of Trustees, and many other stakeholders and industry experts."
Ex. A.

### D.   **Stanford Intentionally Concealed Its Plan to Eliminate Teams.**

169.    Until the moment that Stanford announced the elimination of Plaintiffs' Varsity programs, the University proceeded with "business as usual."  Stanford deliberately concealed from Plaintiffs and their families that it was planning for, or even seriously considering, a substantial reduction in its Varsity teams.

170.    The University has admitted that its clandestine approach was intentional.  As President Tessier-Lavigne, Provost Drell and Athletics Director Muir wrote in the December 16 Letter:

> Although such consultation [with the student athletes and recruits affected by the cuts] would seem appropriate in principle, there is no practical way of executing such a protracted approach without triggering extreme uncertainty and, likely, animosity that would lead to an exodus of student-athletes, coaches, and recruits across many sports (not just the eleven), with lasting, damaging effect.  For this reason, and because we were, unfortunately, confident that this decision was necessary, we proceeded in the way we did, relying on the confidential consultation of many people who were well-positioned to understand the issues and the implications of the various options under consideration.

Ex. A

171.    Upon information and belief, an internal talking points memorandum distributed by the University to Athletics Department administrators on or around July 8, 2020 contained a nearly verbatim explanation for Stanford's secrecy.  The University instructed its administrators to relay this explanation when asked why Stanford concealed its plans from athletes and their families until the July 8 announcement.  Upon information and belief, the internal talking points memorandum was authorized for distribution by Messrs. Tessier-Lavigne, Drell and Muir.

172.    Stanford has thus admitted that it deliberately hid the ball from Plaintiffs because the University knew that if Plaintiffs were aware that the University was considering the elimination of their Varsity programs, Plaintiffs would have made different life decisions about whether to enroll or remain at Stanford.

173.    Instead of providing what it knew to be critical information about the future of Plaintiff's Varsity programs to Plaintiffs, no one at Stanford—including the administration, the Athletics Department or any of Plaintiffs' coaches—ever stated or even suggested during their

respective recruitment, or at any time after they committed to Stanford, that cancelling any of the Eliminated Programs was a possibility.  To the contrary, Stanford affirmatively misrepresented the state of the Eliminated Programs, concealed its plans, and remained silent as Plaintiffs relied on misleading—and at times, blatantly false—statements provided by the University and its agents about the future of these sports.

174.   When Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering cutting the Eliminated Programs, the University affirmatively encouraged, funded, and supported recruiting efforts by the Eliminated Programs' coaches.  Upon information and belief, Stanford was aware that these coaches would explicitly and implicitly inform recruits, including Plaintiffs, that the Eliminated Programs would continue for at least the duration of each Plaintiff's enrollment at Stanford and/or for the duration of his or her athletic eligibility.

175.   Upon information and belief, Stanford continued to fund and support these recruiting efforts and authorized the coaches to speak to recruits, including Plaintiffs, as agents of the University. For example, Stanford maintained the recruiting budgets of each Eliminated Program and paid for travel, lodging, meal and incidental expenses for both coaches and recruits, including Plaintiffs.  In addition, Stanford provided coaches of the Eliminated Programs with on-campus resources for recruiting, including access to recruiting databases and priority access to admissions decisionmakers, and also encouraged coaches to invite recruits, including Plaintiffs, to visit Stanford's campus and to apply to the University for admission.

176.   During these recruiting efforts, coaches of the Eliminated Programs, as agents of the University, represented to Plaintiffs that their respective Varsity program would continue for the duration of his or her enrollment at Stanford and/or the duration of his or her athletic eligibility.

177.   For example, in or around January 2019—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Field Hockey—in an effort to induce Ms. Guden to enroll at Stanford and forgo opportunities to enroll at the other universities that offered her athletic scholarships, Ms. Guden was informed by Coach Danielson, as an authorized agent of the University, that if she chose to enroll at Stanford, Ms. Guden would have

the opportunity to increase the amount of her partial athletic scholarship based on her on-field performance.

178.   Ms. Guden relied on Coach Danielson's statement as an affirmative commitment of the University to provide Ms. Guden the opportunity to participate on Stanford's Varsity Field Hockey team for the duration of her enrollment at Stanford and/or the duration of her athletic eligibility and, in turn, the opportunity to earn an increase in the athletic financial aid that Stanford would provide to her.

179.   Upon information and belief, Stanford knew that Ms. Guden understood Coach Danielson's statement to be a representation that Stanford would continue the Varsity Field Hockey team for the duration of Ms. Guden's enrollment at Stanford and/or the duration of her athletic eligibility, and that Ms. Guden would have the opportunity during that period to earn an increase in the athletic financial aid that Stanford would provide to her.

180.   In or around April 2020—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Field Hockey—Ms. Guden, along with her Field Hockey teammates, were gathered on a Zoom call hosted by Coach Danielson, as an authorized agent of Stanford, to discuss their preferred destination for the team's pre-season training trip during the 2022-23 academic year.

181.   Ms. Guden relied on Coach Danielson's statement as an affirmative commitment of the University to provide Ms. Guden the opportunity to participate on Stanford's Varsity Field Hockey team for the duration of her enrollment at Stanford and/or the duration of her athletic eligibility.

182.   Upon information and belief, Stanford knew that Ms. Guden understood Coach Danielson's statements to be a representation that Stanford would continue the Varsity Field Hockey team for the duration of Ms. Guden's enrollment at Stanford and/or the duration of her athletic eligibility.

183.   In or around June 2019—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Wrestling—in an effort to induce Mr. Stemmet to enroll at Stanford and forgo opportunities to enroll at the other universities that offered him athletic scholarships, Mr. Stemmet was informed by Coach Blake, as an authorized agent of the

University, that if he enrolled at Stanford, Mr. Stemmet would have the opportunity to increase the amount of his partial athletic scholarship for his junior and senior seasons based on his wrestling performance during his freshman and sophomore years.

184. Mr. Stemmet relied on Coach Blake's statement as an affirmative commitment of the University to provide Mr. Stemmet the opportunity to participate on Stanford's Varsity Wrestling team for the duration of his enrollment at Stanford and/or the duration of his athletic eligibility and, in turn, the opportunity to earn an increase in the athletic financial aid that Stanford would provide to him.

185. Upon information and belief, Stanford knew that Mr. Stemmet understood Coach Blake's statement to be a representation that Stanford would continue the Varsity Wrestling team for the duration of Mr. Stemmet's enrollment at Stanford and/or the duration of his athletic eligibility and that Mr. Stemmet would have the opportunity during that period to earn an increase in the athletic financial aid that Stanford would provide to him.

186. On June 19, 2019—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Wrestling—in an effort to induce Mr. Stemmet to enroll at Stanford and forgo opportunities to enroll at the other Universities that offered him athletic scholarships, Coach Blake, as an authorized agent of Stanford, texted Mr. Stemmet that Stanford "would love nothing more than to have [Mr. Stemmet] repping the [Stanford] Cardinal over the next 4-5 years."

187. Mr. Stemmet relied on Coach Blake's statement as an affirmative commitment of the University to provide Mr. Stemmet the opportunity to participate on Stanford's Varsity Wrestling team for the duration of his enrollment at Stanford and/or the duration of his athletic eligibility.

188. Upon information and belief, Stanford knew that Mr. Stemmet understood Coach Blake's statement to be a representation that Stanford would continue the Varsity Wrestling team for the duration of Mr. Stemmet's enrollment at Stanford and/or the duration of his athletic eligibility.

189. In early October 2018 during Mr. Lietzke's on-campus recruiting visit—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Men's Volleyball—in an effort to induce Mr. Lietzke to enroll at Stanford and forgo opportunities to enroll at the other universities that offered him athletic scholarships, Athletics Director

Muir, as an authorized agent of Stanford, told Mr. Lietzke and other recruits that if they selected Stanford, it would be "the best four years of [their] lives."

190.    Mr. Lietzke relied on Mr. Muir's statement as an affirmative commitment of the University to provide Mr. Lietzke the opportunity to participate on Stanford's Varsity Men's Volleyball team for the duration of his enrollment at Stanford and/or the duration of his athletic eligibility.

191.    Upon information and belief, Stanford knew that Mr. Lietzke understood Mr. Muir's statement to be a representation that Stanford would continue the Varsity Men's Volleyball team for the duration of Mr. Lietzke's enrollment at Stanford and/or the duration of his athletic eligibility.

192.    Stanford's public statements and omissions were similarly misleading.

193.    Upon information and belief, prior to the July 8 announcement—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering cancelling the Eliminated Programs—the Stanford Athletics webpages for each of the Field Hockey, Women's Squash, Men's Volleyball, Wrestling, Women's Lightweight Rowing, Synchronized Swimming, and Women's and Men's Fencing teams continuously maintained a link to a "Recruiting Questionnaire." Upon information and belief, one or more Stanford Athletics Department employees is assigned and authorized by the University to maintain and update each of the Eliminated Programs' Athletics webpages.

194.    The Recruiting Questionnaire is utilized by high school students who are interested in participating on a Varsity team at Stanford.  The Questionnaire enables prospective recruits to provide basic biographical and athletic information to teams' coaches so that the athlete can be considered for a roster spot on the team in future years.

195.    By maintaining a Recruiting Questionnaire link on these teams' webpages, Stanford overtly indicated to the Plaintiffs that their programs would continue for years to come and would therefore need to recruit athletes to participate on the team in those future years.

196.    Upon information and belief, prior to the July 8 announcement—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering cancelling

the Eliminated Programs—Stanford publicly and repeatedly solicited donations for the Eliminated Programs, indicating that contributions would support the Eliminated Programs in future seasons.

197.  On March 5, 2020—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering cancelling the Wrestling program—an article authored by Stanford's Executive Editorial Producer, David Kiefer, an authorized agent of the University, and published on Stanford's website entitled "Prodigy," profiled freshman wrestler Shane Griffith.  The article highlighted that Mr. Griffith was "pursued by all the powerhouse programs" but he "chose to be a centerpiece in helping build Stanford into an elite program."

198.  By electing to highlight Mr. Griffith's intention to "build Stanford into an elite program," Stanford overtly indicated that Wrestling would continue as a Varsity program at Stanford for years to come.

199.  On April 18, 2020—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering cancelling the Men's Volleyball program—Stanford published an article on its website entitled "Cardinal Signs Kelly," announcing that Chris Kelly had committed to the program, joining three other members of "Stanford's incoming class of 2024."  The article does not identify an individual author and instead lists "Stanford Athletics" in the byline.

200.  By electing to highlight Mr. Kelly's commitment to enroll as part of Stanford's class of 2024, Stanford indicated that Men's Volleyball would continue as a Varsity program at Stanford for years to come.

201.  On April 13, 2020—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering cancelling the Women's Lightweight Rowing program— Stanford Athletics published a lengthy profile of the team's fundraising effort for Feeding America, entitled "Together While Apart."  The article was authored by Mr. Kiefer.  Ms. Molins was quoted in the article, noting that "in order to have a group of girls return a long time from now, still eager to stay in shape and get right back at it, you have to really love the sport and love the people that you're with."

202.  By electing to utilize Ms. Molins' quote, Stanford indicated that Women's Lightweight Rowing would continue as a Varsity program at Stanford for years to come.

1    203.   Upon information and belief, during the three to four years that Stanford was aware

2    that it would be eliminating numerous Varsity sports and was actively considering cancelling the

3    Eliminated Programs, Stanford published similarly misleading articles on its athletics website with

4    respect to each of the Eliminated Programs.

5    204.   A web archive capture of the "Athletics and Recreation" page of Stanford's

6    Undergraduate Admissions website from June 29, 2020 shows that the University expressly advertised

7    that "the Stanford Athletic Department offers 36 varsity sports—20 for women, 16 for men and one

8    coed—with approximately 900 students participating."[2]  Upon information and belief, one or more

9    Stanford Office of Undergraduate Admissions employees is assigned by the University to maintain

10   and update the Undergraduate Admissions website.

11   205.   A web archive of the same website shows that the same statement appeared on the site

12   on July 17, 2017.[3]  Upon information and belief, the statement remained on Stanford's website through

13   and including July 8, 2020.

14   206.   Today, the website is conspicuously different.  It notes that "*[i]n 2020-2021*, the

15   Stanford Athletic Department offers 36 varsity sports—20 for women, 16 for men and one coed—

16   with approximately 900 students participating."[4]

17   207.   Upon information and belief, Stanford made this critical change to its website after the

18   July 8 announcement because it knew that the original language conveyed to current and prospective

19   students that the University would maintain its thirty-six Varsity sports, including the Eliminated

20   Programs, for years to come.

---

[2]  *Athletics & Recreation*, Stanford Undergraduate Admission (Dec. 20, 2019), https://web.archive.org/web/20200629041149/https://admission.stanford.edu/student/athletics/intercollegiate.html (accessed June 29, 2020).

[3]  *Athletics & Recreation*, Stanford Undergraduate Admission (July 14, 2016), https://web.archive.org/web/20170717111824/https://admission.stanford.edu/student/athletics/intercollegiate.html (accessed July 17, 2017).

[4]  *Athletics & Recreation*, Stanford Undergraduate Admission (Mar. 19, 2021), https://admission.stanford.edu/student/athletics/intercollegiate.html (accessed Apr. 30, 2021) (emphasis added).

208.    In making their decisions to attend or remain at Stanford, Plaintiffs relied on Stanford's public representations that it would continue all of its Varsity sports. Each Plaintiff would have chosen a different school had he or she known that their team might be eliminated.

**E.    Stanford Contractually Committed to Continue the Eliminated Sports for the Duration of Plaintiffs' Enrollment at the University and/or the Duration of Their Athletic Eligibility.**

**i.    The Bicknell Athletic Financial Aid Agreement**

209.    On April 20, 2020—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Women's Squash—Stanford sent Plaintiff Lucia Bicknell a "2020-2024 Multi-Year Athletic Financial Aid Agreement."

210.    The Bicknell Athletic Financial Aid Agreement was signed by Athletics Director Muir and Director of Financial Aid Karen Cooper, as authorized agents of the University, and offered Ms. Bicknell $10,000 per academic year from 2020-21 through 2023-24 in exchange for her agreement to enroll at the University and participate on the Women's Squash team. Further, the Bicknell Athletic Financial Aid Agreement expressly stated that Stanford would continue to provide Ms. Bicknell with $10,000 through the 2023-24 academic year "as long as" Ms. Bicknell, among other things, "ha[s] eligibility remaining in the sport noted on this agreement [*i.e.*, Squash]"; is "in compliance with eligibility requirements of Stanford, the Pac-12 Conference, and the NCAA"; and is "in compliance with all rules, policies and practices established by Stanford University and Stanford Athletics."

211.    Upon information and belief, Stanford knew that Ms. Bicknell understood the Bicknell Athletic Financial Aid Agreement to be an offer for her to participate on the Varsity Women's Squash team for the duration of her enrollment at Stanford and/or the duration of her athletic eligibility and to receive an athletic scholarship of $10,000 per academic year in exchange for Ms. Bicknell's agreement to enroll at, and pay the remaining balance of her tuition to, the University.

212.    At no time did Stanford inform Ms. Bicknell that it would be eliminating numerous Varsity teams or that it was actively considering the elimination of the Women's Squash team.

213.    On April 21, 2020, in reliance on the University's representations, Ms. Bicknell executed the Bicknell Athletic Financial Aid Agreement and accepted Stanford's offer.

ii.   **The Guden Athletic Financial Aid Agreement**

214.   On November 13, 2019—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Field Hockey—Stanford sent Plaintiff Caroline Guden a "2020-2024 Multi-Year Athletic Financial Aid Agreement."

215.   The Guden Athletic Financial Aid Agreement was signed by Stanford Athletics Director Muir and Director of Financial Aid Cooper, as authorized agents of the University, and offered Ms. Guden a 100 percent athletic scholarship for academic years 2020-21 and 2022-23 and no scholarship for academic years 2021-22 and 2023-24 in exchange for her agreement to enroll at the University and participate on the Field Hockey team.  Further, the Guden Athletic Financial Aid Agreement expressly stated that Stanford would continue to provide Ms. Guden with these agreed-upon scholarship amounts through the 2023-24 academic year "as long as" Ms. Guden, among other things, "ha[s] eligibility remaining in the sport noted on this agreement [*i.e.*, Field Hockey]; is "in compliance with eligibility requirements of Stanford, the Pac-12 Conference, and the NCAA"; and is "in compliance with all rules, policies and practices established by Stanford University and Stanford Athletics."

216.   Upon information and belief, Stanford knew that Ms. Guden understood the Guden Athletic Financial Aid Agreement to be an offer for her to participate on the Varsity Field Hockey team for the duration of her enrollment at Stanford and/or the duration of her athletic eligibility and to receive the agreed-upon athletic scholarship in exchange for Ms. Guden's agreement to enroll at, and pay the remaining balance of her tuition to, the University.

217.   At no time did Stanford inform Ms. Guden that it would be eliminating numerous Varsity teams or that it was actively considering the elimination of the Field Hockey team.

218.   On November 14, 2019, in reliance on the University's representations, Ms. Guden executed the Guden Athletic Financial Aid Agreement and accepted Stanford's offer.

### iii.    The Lietzke Athletic Financial Aid Agreement

219.    On November 14, 2018—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Men's Volleyball—Stanford sent Plaintiff Nathan Lietzke a "2019-2023 Multi-Year Athletic Financial Aid Agreement."

220.    The Lietzke Athletic Financial Aid Agreement was signed by Athletics Director Muir and Director of Financial Aid Cooper, as authorized agents of the University, and offered Mr. Lietzke a 40 percent scholarship for the 2019-20 academic year and a 30 percent scholarship for the 2020-21 through 2022-23 academic years in exchange for his agreement to enroll at the University and participate on the Men's Volleyball team.  Further, the Lietzke Athletic Financial Aid Agreement expressly stated that Stanford would continue to provide Mr. Lietzke with the applicable 30 percent or 40 percent scholarship through the 2022-23 academic year "as long as" Mr. Lietzke, among other things, "ha[s] eligibility remaining in the sport noted on this agreement [*i.e.*, Men's Volleyball]; is "in compliance with eligibility requirements of Stanford, the Pac-12 Conference, and the NCAA"; and is "in compliance with all rules, policies and practices established by Stanford University and Stanford Athletics."

221.    Upon information and belief, Stanford knew that Mr. Lietzke understood the Lietzke Athletic Financial Aid Agreement to be an offer for him to participate on the Varsity Men's Volleyball team for the duration of his enrollment at Stanford and/or the duration of his athletic eligibility and to receive the applicable 30 percent or 40 percent athletic scholarship each academic year in exchange for Mr. Lietzke's agreement to enroll at, and pay the remaining balance of his tuition to, the University.

222.    At no time did Stanford inform Mr. Lietzke that it would be eliminating numerous Varsity teams or that it was actively considering the elimination of the Men's Volleyball team.

223.    On November 15, 2018, in reliance on the University's representations, Mr. Lietzke executed the Lietzke Athletic Financial Aid Agreement and accepted Stanford's offer.

### iv.   **The Stemmet Athletic Financial Aid Agreement**

224.   On November 13, 2019—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Wrestling—Stanford sent Plaintiff Nick Stemmet a "2020-2024 Multi-Year Athletic Financial Aid Agreement."

225.   The Stemmet Athletic Financial Aid Agreement was signed by Athletics Director Muir and Director of Financial Aid Cooper, as authorized agents of the University and offered Mr. Stemmet an athletic scholarship during the 2020-21 academic year to cover only the cost of his "Books" and a 100 percent athletic scholarship in the 2021-22 academic year in exchange for his agreement to enroll at the University and participate on the Wrestling team.  Further, the Stemmet Athletic Financial Aid Agreement expressly stated that Stanford would continue to provide Mr. Stemmet with the agreed-upon scholarships "as long as" Mr. Stemmet, among other things, "ha[s] eligibility remaining in the sport noted on this agreement [*i.e.*, Wrestling]; is "in compliance with eligibility requirements of Stanford, the Pac-12 Conference, and the NCAA"; and is "in compliance with all rules, policies and practices established by Stanford University and Stanford Athletics."

226.   Upon information and belief, Stanford knew that Mr. Stemmet understood the Stemmet Athletic Financial Aid Agreement to be an offer for him to participate on the Varsity Wrestling team for the duration of his enrollment at Stanford and/or the duration of his athletic eligibility and to receive the agreed-upon an athletic scholarship in exchange for Mr. Stemmet's agreement to enroll at, and pay the remaining balance of his tuition to, the University.

227.   At no time did Stanford inform Mr. Stemmet that it would be eliminating numerous Varsity teams or that it was actively considering the elimination of the Wrestling team.

228.   On November 13, 2019, in reliance on the University's representations, Mr. Stemmet executed the Stemmet Athletic Financial Aid Agreement and accepted Stanford's offer.

### v.   **The Molins Commitment Letter**

229.   On November 8, 2017—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Women's Lightweight Rowing—

Stanford sent Plaintiff Emily Molins a letter, frequently referred to in college athletics as a "Commitment Letter."

230. The Molins Commitment Letter was signed by Women's Lightweight Rowing Coach, Kate Bertko, an authorized agent of the University, and requested that Ms. Molins sign the document to affirm her "intention of attending Stanford University and being a member of the [Women's Lightweight Rowing] program." The Molins Commitment Letter noted that Ms. Molins was "critical to [the Women's Lightweight Rowing team] recruiting class," encouraged Ms. Molins to publicly announce her decision to enroll at Stanford and join the Varsity Women's Lightweight Rowing team, and promised that Stanford was "dedicated to giving [its] very best efforts in developing [Ms. Molins'] academic and athletic abilities."

231. Upon information and belief, Stanford knew that Ms. Molins understood the Molins Commitment Letter to be an offer for her to participate on the Varsity Women's Lightweight Rowing team for the duration of her enrollment at Stanford and/or the duration of her athletic eligibility, in exchange for Ms. Molins' agreement to enroll at, and pay tuition to, the University.

232. At no time did Stanford inform Ms. Molins that it would be eliminating numerous Varsity teams or that it was actively considering the elimination of the Women's Lightweight Rowing team.

233. In reliance on the University's representations, Ms. Molins accepted Stanford's offer.

**vi.    The Koo Early Admission Letter**

234. In August 2019—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Women's Fencing—Stanford sent Plaintiff Haley Koo a letter informing her that Stanford's athletic-based early review of her admission application had been approved.

235. The Koo Early Admission Letter was signed by Richard H. Shaw, Stanford's Dean of Admission and Financial Aid, an authorized agent of the University, with a copy sent to Lisa Posthumus, Stanford's Head Fencing Coach. The Koo Early Admission Letter noted that "[i]t [was] a tribute to [Ms. Koo's] outstanding achievements as a student-athlete that [Stanford's] Department of

Athletics ha[d] requested an early review of [Ms. Koo's] application for admission to Stanford" and that Stanford had approved her admission "well ahead of [its] regular notification period," which is "in early April 2020 [for] other students."

236.    Upon information and belief, Stanford knew that Ms. Koo understood the Koo Early Admission Letter to be an offer for her to participate on the Varsity Women's Fencing team for the duration of her enrollment at Stanford and/or the duration of her athletic eligibility, in exchange for Ms. Koo's agreement to enroll at, and pay tuition to, the University.

237.    At no time did Stanford inform Ms. Koo that it would be eliminating numerous Varsity teams or that it was actively considering the elimination of the Women's Fencing team.

238.    In reliance on the University's representations, Ms. Koo enrolled at Stanford and accepted the University's offer.

### vii.    The Rayle Early Admission Letter

239.    In October 2019—when Stanford was aware that it would be eliminating numerous Varsity sports and was actively considering eliminating Men's Fencing—Stanford sent Plaintiff Evan Kai Rayle a letter informing him that Stanford's athletic-based early review of his admission application had been approved.

240.    The Rayle Early Admission Letter was signed by Dean Shaw, an authorized agent of the University, with a copy sent to Coach Posthumus. The Rayle Early Admission Letter noted that "[i]t [was] a tribute to [Mr. Rayle's] outstanding achievements as a student-athlete that [Stanford's] Department of Athletics ha[d] requested an early review of [Mr. Rayle's] application for admission to Stanford" and that Stanford had approved his admission "well ahead of [its] regular notification period," which is "in early April 2020 [for] other students."

241.    Upon information and belief, Stanford knew that Mr. Rayle understood the Rayle Early Admission Letter to be an offer for him to participate on the Varsity Men's Fencing team for the duration of his enrollment at Stanford and/or the duration of his athletic eligibility, in exchange for Mr. Rayle's agreement to enroll at, and pay tuition to, the University.

242.    At no time did Stanford inform Mr. Rayle that it would be eliminating numerous Varsity teams or that it was actively considering the elimination of the Men's Fencing team.

243.    In reliance on the University's representations, Mr. Rayle enrolled at Stanford and accepted the University's offer.

### FIRST CAUSE OF ACTION
### FRAUD/INTENTIONAL MISREPRESENTATION
### (as to all Plaintiffs)

244.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

245.    For as many as four years prior to the July 8, 2020 announcement, Stanford had knowledge that it would be eliminating numerous Varsity teams and that it was actively considering the cancellation of each of the Eliminated Programs.

246.    Information that Stanford would be eliminating numerous Varsity teams and that it was actively considering the cancellation of each of the Eliminated Programs was not reasonably available to Plaintiffs.

247.    Stanford intentionally, or recklessly and without regard for the truth, misrepresented to Plaintiffs that their respective Eliminated Programs would continue for the duration of Plaintiffs' enrollment at Stanford and/or for the duration of his or her athletic eligibility by, among other things: (a) maintaining active links to Recruiting Questionnaires on its website; (b) publishing articles and information on its website indicating that the Eliminated Programs would continue for multiple years; (c) advertising that the University sponsored thirty-six Varsity sports on its admissions website; (d) publicizing that new recruits had committed to the Eliminated Programs, including for seasons that Stanford knew the Eliminated Programs would not be competing; (e) instructing and permitting coaches of the Eliminated Programs to proceed as if the teams would be continuing, including by funding, encouraging and supporting recruiting efforts; (f) making statements to Ms. Guden and Mr. Stemmet, through their respective coaches, that they would have the opportunity to increase their athletic scholarships in future years based on their athletic performance; and (f) making statements to

Mr. Stemmet and Mr. Lietzke, during their recruitment, indicating that each of his Varsity programs would last for the duration of his athletic eligibility.

248.    Stanford knew that its representations were false or lacked regard for the truth.

249.    In the December 16, 2020 Letter and in its internally distributed talking points memorandum, Stanford admitted that it intentionally concealed information that it would be eliminating numerous Varsity teams and that it was actively considering the cancellation of each of the Eliminated Programs because Stanford knew that the truth would have been material to, and would have altered, Plaintiffs' decision-making.

250.    Stanford admitted that it was incentivized to conceal this critical information from Plaintiffs and to instead misrepresent the future of the Eliminated Programs to avoid uncertainty, animosity, and an exodus of student athletes, coaches, and recruits across many sports, including Plaintiffs.

251.    Stanford's misrepresentations were intended to deceive and induce, and did deceive and induce, Plaintiffs to rely on the mistaken belief that each of their Varsity programs would continue for the duration of their enrollment at Stanford and/or for the duration of their athletic eligibility when evaluating whether to enroll or remain at Stanford.

252.    Plaintiffs reasonably and justifiably relied on Stanford's misrepresentations when Plaintiffs understood that each of their Varsity programs would continue for the duration of their enrollment at Stanford and/or for the duration of their athletic eligibility.

253.    Stanford's misrepresentations were material in that had Plaintiffs been aware that Stanford would be eliminating numerous Varsity teams and that it was actively considering the cancellation of each of the Eliminated Programs, Plaintiffs would have taken different actions when determining whether to enroll or remain at Stanford.

254.    As a result of Stanford's misrepresentations, Plaintiffs elected to enroll and/or remain at Stanford under the mistaken belief that each of their Varsity programs would continue for the duration of their enrollment at Stanford and/or for the duration of their athletic eligibility.

255.    As a result of Stanford's misrepresentations, if Stanford is not enjoined to maintain the status quo, each Plaintiff will suffer damages in excess of $75,000 as a result of Stanford's unlawful actions.

256.    If Stanford enacts its announced plan to cancel the Eliminated Programs, Plaintiffs will suffer irreparable harm that is incapable of being compensated by money damages, as playing on a Varsity team during a student's time in college is a once-in-a-lifetime experience.  Plaintiffs have developed friendships, support systems and other tangible and intangible connections at Stanford with the belief and expectation that each Plaintiff's Varsity program would remain available for the duration of his or her enrollment at the University and/or the duration of his or her athletic eligibility.  Had Plaintiffs known that their Varsity programs would be discontinued, Plaintiffs would have chosen to develop those friendships, relationships, and other tangible and intangible connections at another institution in which Plaintiffs could participate on a Varsity team for the duration of their time as collegiate athletes.  Further, Plaintiffs' varsity athletic careers are limited in time, and if their respective Eliminated Programs are cancelled, each Plaintiff:  (a) will not have the ability to practice with their teammates; (b) will not have the ability to participate in Varsity-level games; (c) will suffer from diminished skill from lack of practice and competition, making it difficult for each Plaintiff to ever regain his or her full level of skill; (d) will miss out on the exposure and experiences that come with Varsity-level competition, including coaching; and (e) will be deprived of competitive opportunities that he or she can never recapture, including winning championships or athletics awards or, in some cases, being invited to participate on national teams.

**SECOND CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT**
**(as to all Plaintiffs)**

257.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258.    For as many as four years prior to the July 8, 2020 announcement, Stanford had knowledge that it would be eliminating numerous Varsity teams and that it was actively considering the cancellation of each of the Eliminated Programs.

259.   Information that Stanford would be eliminating numerous Varsity teams and that it was actively considering the cancellation of the Eliminated Programs was not reasonably available to Plaintiffs.

260.   Stanford did not disclose to Plaintiffs that it would be eliminating numerous Varsity teams or that it was actively considering the cancellation of each of the Eliminated Programs.

261.   Stanford had a duty to disclose to Plaintiffs that it would be eliminating numerous Varsity teams and that it was actively considering the cancellation of each of the Eliminated Programs because Stanford knew that such information was material, was in the exclusive possession of Stanford, and was actively concealed by Stanford.

262.   Stanford's active concealment was material in that had Plaintiffs been aware that Stanford would be eliminating numerous Varsity teams and that it was actively considering the cancellation of each of the Eliminated Programs, Plaintiffs would have taken different actions when determining whether to enroll or remain at Stanford.

263.   In its December 16, 2020 Letter and in its internally distributed talking points memorandum, Stanford admitted that it intentionally concealed that it would be eliminating numerous Varsity teams and that it was actively considering the cancellation of each of the Eliminated Programs because Stanford knew that such information would have been material to, and would have altered, Plaintiffs' decision-making.

264.   Stanford admitted that it was incentivized to conceal this critical information from Plaintiffs to avoid uncertainty, animosity, and an exodus of student athletes, coaches, and recruits across many sports, including Plaintiffs.

265.   Stanford's active concealment was intended to induce, and did induce, Plaintiffs to rely on the mistaken belief that each of their Varsity programs would continue for the duration of their enrollment at Stanford and/or for the duration of their athletic eligibility.

266.   As a result of Stanford's concealment, Plaintiffs elected to enroll and/or remain at Stanford under the mistaken belief that each of their Varsity programs would continue for the duration of their enrollment at Stanford and/or for the duration of their athletic eligibility.

267.    As a result of Stanford's concealment, if Stanford is not enjoined to maintain the status quo, each Plaintiff will suffer damages in excess of $75,000 as a result of Stanford's unlawful actions.

268.    If Stanford enacts its announced plan to cancel the Eliminated Programs, Plaintiffs will suffer irreparable harm that is incapable of being compensated by money damages, as playing on a Varsity team during a student's time in college is a once-in-a-lifetime experience.  Plaintiffs have developed friendships, support systems and other tangible and intangible connections at Stanford with the belief and expectation that each Plaintiff's Varsity program would remain available for the duration of his or her enrollment at the University and/or the duration of his or her athletic eligibility.  Had Plaintiffs known that their Varsity programs would be discontinued, Plaintiffs would have chosen to develop those friendships, relationships, and other tangible and intangible connections at another institution in which Plaintiffs could participate on a Varsity team for the duration of their time as collegiate athletes.  Further, Plaintiffs' varsity athletic careers are limited in time, and if their respective Eliminated Programs are cancelled, each Plaintiff:  (a) will not have the ability to practice with their teammates; (b) will not have the ability to participate in Varsity-level games; (c) will suffer from diminished skill from lack of practice and competition, making it difficult for each Plaintiff to ever regain his or her full level of skill; (d) will miss out on the exposure and experiences that come with Varsity-level competition, including coaching; and (e) will be deprived of competitive opportunities that he or she can never recapture, including winning championships or athletics awards or, in some cases, being invited to participate on national teams.

### THIRD CAUSE OF ACTION
### FRAUDULENT INDUCEMENT
### (as to all Plaintiffs)

269.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

270.    For as many as four years prior to the July 8, 2020 announcement, Stanford had knowledge that it would be eliminating numerous Varsity teams and that it was actively considering the cancellation of each of the Eliminated Programs.

271.    Information that Stanford would be eliminating numerous Varsity teams and that it was actively considering the cancellation of each of the Eliminated Programs was not reasonably available to Plaintiffs.

272.    Stanford intentionally, or recklessly and without regard for the truth, misrepresented to Plaintiffs that their respective Eliminated Programs would continue for the duration of Plaintiffs' enrollment at Stanford and/or for the duration of his or her athletic eligibility by, among other things: (a) maintaining active links to Recruiting Questionnaires on its website; (b) publishing articles and information on its website indicating that the Eliminated Programs would continue for multiple years; (c) advertising that the University sponsored thirty-six Varsity sports on its admissions website; (d) publicizing that new recruits had committed to the Eliminated Programs, including for seasons that Stanford knew the Eliminated Programs would not be competing; (e) instructing and permitting coaches of the Eliminated Programs to proceed as if the teams would be continuing, including by funding, encouraging and supporting recruiting efforts; (f) making statements to Ms. Guden and Mr. Stemmet, through their respective coaches, that they would have the opportunity to increase their athletic scholarships in future years based on their athletic performance; and (f) making statements to Mr. Stemmet and Mr. Lietzke, during their recruitment, indicating that each of his Varsity programs would last for the duration of his athletic eligibility.

273.    Stanford knew that its representations were false or lacked regard for the truth.

274.    In the December 16, 2020 Letter and in its internally distributed talking points memorandum, Stanford admitted that it intentionally misrepresented that it would be eliminating numerous Varsity teams and that it was actively considering the cancellation of each of the Eliminated Programs because Stanford knew that the truth would have been material to, and would have altered, Plaintiffs' decision-making.

275.    Stanford admitted that it was incentivized to conceal this critical information from Plaintiffs and to instead misrepresent the future of the Eliminated Programs to avoid uncertainty, animosity, and an exodus of student athletes, coaches, and recruits across many sports, including Plaintiffs.

276.   Stanford's misrepresentations were intended to deceive and induce, and did deceive and induce, Plaintiffs to rely on the mistaken belief that each of their Varsity programs would continue for the duration of their enrollment at Stanford and/or for the duration of their athletic eligibility when evaluating whether to enroll or remain at Stanford.

277.   Plaintiffs reasonably and justifiably relied on Stanford's misrepresentations when Plaintiffs understood that each of their Varsity programs would continue for the duration of their enrollment at Stanford and/or for the duration of their athletic eligibility.

278.   Stanford's misrepresentations were material in that had Plaintiffs been aware that Stanford would be eliminating numerous Varsity teams and that it was actively considering the cancellation of each of the Eliminated Programs, Plaintiffs would have taken different actions when determining whether to enroll or remain at Stanford.

279.   As a result of Stanford's misrepresentations, Plaintiffs elected to enroll and/or remain at Stanford under the mistaken belief that each of their Varsity programs would continue for the duration of their enrollment at Stanford and/or for the duration of their athletic eligibility.

280.   The student-university relationship is contractual in nature.   Stanford intended its misrepresentations to induce, and Stanford's misrepresentations did induce, Plaintiffs to enter into the student-university contractual relationship.

281.   As a result of Stanford's misrepresentations, if Stanford is not enjoined to maintain the status quo, each Plaintiff will suffer damages in excess of $75,000 as a result of Stanford's unlawful actions.

282.   If Stanford enacts its announced plan to cancel the Eliminated Programs, Plaintiffs will suffer irreparable harm that is incapable of being compensated by money damages, as playing on a Varsity team during a student's time in college is a once-in-a-lifetime experience.   Plaintiffs have developed friendships, support systems and other tangible and intangible connections at Stanford with the belief and expectation that each Plaintiff's Varsity program would remain available for the duration of his or her enrollment at the University and/or the duration of his or her athletic eligibility.   Had Plaintiffs known that their Varsity programs would be discontinued, Plaintiffs would have chosen to develop those friendships, relationships, and other tangible and intangible connections at another

institution in which Plaintiffs could participate on a Varsity team for the duration of their time as collegiate athletes. Further, Plaintiffs' varsity athletic careers are limited in time, and if their respective Eliminated Programs are cancelled, each Plaintiff: (a) will not have the ability to practice with their teammates; (b) will not have the ability to participate in Varsity-level games; (c) will suffer from diminished skill from lack of practice and competition, making it difficult for each Plaintiff to ever regain his or her full level of skill; (d) will miss out on the exposure and experiences that come with Varsity-level competition, including coaching; and (e) will be deprived of competitive opportunities that he or she can never recapture, including winning championships or athletics awards or, in some cases, being invited to participate on national teams.

**FOURTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**(as to all Plaintiffs)**

283. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

284. For as many as four years prior to the July 8, 2020 announcement, Stanford had knowledge that it would be eliminating numerous Varsity teams and that it was actively considering the cancellation of each of the Eliminated Programs.

285. Information that Stanford would be eliminating numerous Varsity teams and that it was actively considering the elimination of each of the Eliminated Programs was not reasonably available to Plaintiffs.

286. Stanford represented to Plaintiffs that their respective Eliminated Programs would continue for the duration of Plaintiffs' enrollment at Stanford and/or for the duration of his or her athletic eligibility by, among other things: (a) maintaining active links to Recruiting Questionnaires on its website; (b) publishing articles and information on its website indicating that the Eliminated Programs would continue for multiple years; (c) advertising that the University sponsored 36 Varsity sports on its admissions website; (d) publicizing that new recruits had committed to the Eliminated Programs, including for seasons that Stanford knew the Eliminated Programs would not be competing; (e) instructing and permitting coaches of the Eliminated Programs to proceed as if the teams would be

continuing, including by funding, encouraging and supporting recruiting efforts; (f) making statements to Ms. Guden and Mr. Stemmet, through their respective coaches, that they would have the opportunity to increase their athletic scholarships in future years based on their athletic performance; and (f) statements to Mr. Stemmet and Mr. Lietzke, during their recruitment, indicating that each of his Varsity programs would last for the duration of his athletic eligibility.

287.    Stanford did not have reasonable grounds for believing its representations to be true.

288.    In its December 16, 2020 Letter and in its internally distributed talking points memorandum, Stanford admitted that it misrepresented that it would be eliminating numerous Varsity teams and that it was actively considering the elimination of each of the Eliminated Programs because Stanford knew that the truth would have been material to, and would have altered, Plaintiffs' decision-making.

289.    Stanford admitted that it was incentivized to conceal this critical information from Plaintiffs and to instead misrepresent the future of the Eliminated Programs to avoid uncertainty, animosity, and an exodus of student athletes, coaches, and recruits across many sports, including Plaintiffs.

290.    Stanford's misrepresentations were intended to deceive and induce, and did deceive and induce, Plaintiffs to rely on the mistaken belief that each of their Varsity programs would continue for the duration of their enrollment at Stanford and/or for the duration of their athletic eligibility when evaluating whether to enroll or remain at Stanford.

291.    Plaintiffs reasonably and justifiably relied on Stanford's misrepresentations when they mistakenly understood that each of their Varsity programs would continue for the duration of their enrollment at Stanford and/or for the duration of their athletic eligibility.

292.    Stanford's misrepresentations were material in that had Plaintiffs been aware that Stanford would be eliminating numerous Varsity teams and that it was actively considering the elimination of each of the Eliminated Programs, Plaintiffs would have taken different actions when determining whether to enroll or remain at Stanford.

293.    As a result of Stanford's misrepresentations, Plaintiffs elected to enroll and/or remain at Stanford under the mistaken belief that each of their Varsity programs would continue for the duration of their enrollment at Stanford and/or for the duration of their athletic eligibility.

294.    As a result of Stanford's misrepresentations, if Stanford is not enjoined to maintain the status quo, each Plaintiff will suffer damages in excess of $75,000 as a result of Stanford's unlawful actions.

295.    If Stanford enacts its announced plan to cancel the Eliminated Programs, Plaintiffs will suffer irreparable harm that is incapable of being compensated by money damages, as playing on a Varsity team during a student's time in college is a once-in-a-lifetime experience.  Plaintiffs have developed friendships, support systems and other tangible and intangible connections at Stanford with the belief and expectation that each Plaintiff's Varsity program would remain available for the duration of his or her enrollment at the University and/or the duration of his or her athletic eligibility.  Had Plaintiffs known that their Varsity programs would be discontinued, Plaintiffs would have chosen to develop those friendships, relationships, and other tangible and intangible connections at another institution in which Plaintiffs could participate on a Varsity team for the duration of their time as collegiate athletes.  Further, Plaintiffs' varsity athletic careers are limited in time, and if their respective Eliminated Programs are cancelled, each Plaintiff:  (a) will not have the ability to practice with their teammates; (b) will not have the ability to participate in Varsity-level games; (c) will suffer from diminished skill from lack of practice and competition, making it difficult for each Plaintiff to ever regain his or her full level of skill; (d) will miss out on the exposure and experiences that come with Varsity-level competition, including coaching; and (e) will be deprived of competitive opportunities that he or she can never recapture, including winning championships or athletics awards or, in some cases, being invited to participate on national teams.

**FIFTH CAUSE OF ACTION**
**BREACH OF CONTRACT**
**(as to all Plaintiffs)**

296.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

1    297.    The student-university relationship is contractual in nature.

2    298.    A contract existed between each Plaintiff on the one hand and Stanford on the other

3    hand.

4    299.    The terms of the contract required Plaintiff to enroll at Stanford and to pay to the

5    University full or partial tuition, room and board, fees and other costs associated with preparing to

6    attend and attending Stanford.  In exchange, Stanford promised each Plaintiff that his or her Varsity

7    athletic program would remain available for the duration of his or her enrollment at Stanford.

8    300.    Each Plaintiff accepted the terms of the contract through performance.

9    301.    Stanford was aware that each Plaintiff reasonably and justifiably understood the offer

10   by Stanford to include the availability of his or her Varsity program for the duration of his or her

11   enrollment at Stanford and/or the duration of his or her athletic eligibility.

12   302.    With respect to each Plaintiff, this contract was implied-in-fact.

13   303.    Stanford breached each contract by discontinuing the Eliminated Programs prior to the

14   conclusion of each Plaintiff's enrollment at Stanford or his or her athletic eligibility.

15   304.    Stanford's breach was unjustified.

16   305.    As a result of Stanford's breach, if Stanford is not enjoined to maintain the status quo,

17   each Plaintiff will suffer damages in excess of $75,000 as a result of Stanford's unlawful actions.

18   306.    If Stanford enacts its announced plan to cancel the Eliminated Programs, Plaintiffs will

19   suffer irreparable harm that is incapable of being compensated by money damages, as playing on a

20   Varsity team during a student's time in college is a once-in-a-lifetime experience.  Plaintiffs have

21   developed friendships, support systems and other tangible and intangible connections at Stanford with

22   the belief and expectation that each Plaintiff's Varsity program would remain available for the duration

23   of his or her enrollment at the University and/or the duration of his or her athletic eligibility.  Had

24   Plaintiffs known that their Varsity programs would be discontinued, Plaintiffs would have chosen to

25   develop those friendships, relationships, and other tangible and intangible connections at another

26   institution in which Plaintiffs could participate on a Varsity team for the duration of their time as

27   collegiate athletes.  Further, Plaintiffs' varsity athletic careers are limited in time, and if their respective

28   Eliminated Programs are cancelled, each Plaintiff: (a) will not have the ability to practice with their

teammates; (b) will not have the ability to participate in Varsity-level games; (c) will suffer from diminished skill from lack of practice and competition, making it difficult for each Plaintiff to ever regain his or her full level of skill; (d) will miss out on the exposure and experiences that come with Varsity-level competition, including coaching; and (e) will be deprived of competitive opportunities that he or she can never recapture, including winning championships or athletics awards or, in some cases, being invited to participate on national teams.

**SIXTH CAUSE OF ACTION**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(as to all Plaintiffs)**

307.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

308.   As part of each of the contracts entered into between each Plaintiff on the one hand and Stanford on the other, Stanford owed each Plaintiff an implied duty of good faith and fair dealing.

309.   Each of the contracts entered into between each Plaintiff on the one hand and Stanford on the other gave each Plaintiff the reasonable expectation that his or her Varsity program would remain available for the duration of his or her enrollment at the University and/or the duration of his or her athletic eligibility.

310.   Plaintiffs each fulfilled their obligations under the contract by enrolling at Stanford and paying to the University full or partial tuition, room and board, fees or other costs associated with preparing to attend and attending Stanford.

311.   Stanford knew that each Plaintiff had the reasonable expectation that his or her Varsity program would remain available for the duration of his or her enrollment at the University and/or the duration of his or her athletic eligibility.

312.   Stanford withheld and misrepresented, in bad faith, facts related to the future of each Plaintiff's Varsity program that were material to each Plaintiff's decision-making.

313.   Stanford's concealment and misrepresentations (a) run contrary to the parties' reasonable expectations; (b) run contrary to the reasonable interpretation of the contracts entered into between each Plaintiff on the one hand and Stanford on the other; and (c) interfere with each Plaintiff's

45
COMPLAINT

1   right to receive the full benefits of the agreement, namely the availability of each Plaintiff's Varsity

2   program for the duration of his or her enrollment at the University and/or the duration of his or her

3   athletic eligibility

4         314.   As a result of Stanford's misrepresentations, if Stanford is not enjoined to maintain the

5   status quo, each Plaintiff will suffer damages in excess of $75,000 as a result of Stanford's unlawful

6   actions.

7         315.   If Stanford enacts its announced plan to cancel the Eliminated Programs, Plaintiffs will

8   suffer irreparable harm that is incapable of being compensated by money damages, as playing on a

9   Varsity team during a student's time in college is a once-in-a-lifetime experience.  Plaintiffs have

10  developed friendships, support systems and other tangible and intangible connections at Stanford with

11  the belief and expectation that each Plaintiff's Varsity program would remain available for the duration

12  of his or her enrollment at the University and/or the duration of his or her athletic eligibility.  Had

13  Plaintiffs known that their Varsity programs would be discontinued, Plaintiffs would have chosen to

14  develop those friendships, relationships, and other tangible and intangible connections at another

15  institution in which Plaintiffs could participate on a Varsity team for the duration of their time as

16  collegiate athletes.  Further, Plaintiffs' varsity athletic careers are limited in time, and if their respective

17  Eliminated Programs are cancelled, each Plaintiff:  (a) will not have the ability to practice with their

18  teammates; (b) will not have the ability to participate in Varsity-level games; (c) will suffer from

19  diminished skill from lack of practice and competition, making it difficult for each Plaintiff to ever

20  regain his or her full level of skill; (d) will miss out on the exposure and experiences that come with

21  Varsity-level competition, including coaching; and (e) will be deprived of competitive opportunities

22  that he or she can never recapture, including winning championships or athletics awards or, in some

23  cases, being invited to participate on national teams.

### SEVENTH CAUSE OF ACTION
### UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200, *et seq.*
### (as to all Plaintiffs)

26        316.   Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

27  allegation set forth in the preceding paragraphs of this Complaint.

317.   The California Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business or act or practice" including the employment of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact. Cal. Bus. Prof. Code § 17200.

318.   Stanford violated Cal. Bus. & Prof Code. §§ 17200, *et. seq.* by engaging in "unlawful" and "fraudulent" acts or practices, including but not limited to, intentionally, recklessly, or negligently and without regard for the truth, concealing and misrepresenting that it would be eliminating numerous Varsity teams and that it was actively considering cancelling each of the Eliminated Programs, with the knowledge and intent that each Plaintiff would reasonably and justifiably rely on the mistaken belief that his or her Varsity program would continue for the duration of his or her enrollment at Stanford and/or the duration of his or her athletic eligibility in deciding whether to enroll or remain at Stanford and with the awareness that such belief was a substantial factor in each Plaintiff's decision.

319.   Members of the public are likely to have been deceived by Stanford's conduct, which Stanford engaged in openly.

320.   Each Plaintiff has suffered injury-in-fact, including the loss of money and/or property in excess of $75,000, as a direct and proximate result of Stanford's unlawful and fraudulent acts or practices in the form of, among other things, paying Stanford tuition, room and board, University fees or other costs associated with preparing to attend, and attending, Stanford and preparing to participate, and participating, on their respective Eliminated Programs.

321.   Plaintiffs' legal remedies, individually and collectively, are inadequate in that the available remedies do not compensate any or all Plaintiffs for irreparable harm that is incapable of being compensated by money damages, as playing on a Varsity team during a student's time in college is a once-in-a-lifetime experience. Plaintiffs have developed friendships, support systems and other tangible and intangible connections at Stanford with the belief and expectation that each Plaintiff's Varsity program would remain available for the duration of his or her enrollment at the University and/or the duration of his or her athletic eligibility. Had Plaintiffs known that their Varsity programs would be discontinued, Plaintiffs would have chosen to develop those friendships, relationships, and other tangible and intangible connections at another institution in which Plaintiffs could participate on

a Varsity team for the duration of their time as collegiate athletes.  Further, Plaintiffs' varsity athletic careers are limited in time, and if their respective Eliminated Programs are cancelled, each Plaintiff: (a) will not have the ability to practice with their teammates; (b) will not have the ability to participate in Varsity-level games; (c) will suffer from diminished skill from lack of practice and competition, making it difficult for each Plaintiff to ever regain his or her full level of skill; (d) will miss out on the exposure and experiences that come with Varsity-level competition, including coaching; and (e) will be deprived of competitive opportunities that he or she can never recapture, including winning championships or athletics awards or, in some cases, being invited to participate on national teams.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Stanford:

1.      Finding in favor of Plaintiffs on all counts asserted herein;

2.      Preliminarily enjoining Stanford from discontinuing each of the Eliminated Programs;

3.      Ordering that each of the Eliminated Programs be maintained by Stanford at least until the applicable Plaintiff has graduated, has otherwise left Stanford, or is no longer eligible to participate on the applicable Eliminated Program;

4.      Awarding compensatory damages to each Plaintiff in an amount to be determined at trial;

5.      Awarding punitive damages for Stanford's fraudulent actions;

6.      Ordering restitution and all other forms of equitable monetary relief;

7.      Awarding pre-judgment and post-judgment interest at the maximum legal rate;

8.      Awarding Plaintiffs' costs, expenses and reasonable attorneys' fees in this action; and

9.      Ordering such other relief as the Court may deem just and equitable.

1   Dated: May 12, 2021                    Respectfully submitted,

2                                          WINSTON & STRAWN LLP

3                                          By _____ */s/ Jeanifer Parsigian*_____
                                           Jeanifer Parsigian (SBN 289001)
4                                          WINSTON & STRAWN LLP
                                           101 California Street
5                                          San Francisco, CA 94111
                                           Telephone: (415) 591-1000
6                                          Facsimile: (415) 591-1400
                                           JParsigian@winston.com
7
                                           Jeffrey L. Kessler (*pro hac vice* forthcoming)
8                                          Jonathan Amoona (*pro hac vice* forthcoming)
                                           Adam I. Dale (*pro hac vice* forthcoming)
9                                          200 Park Avenue
                                           New York, NY 10166-4193
10                                         Telephone: (212) 294-6700
                                           Facsimile: (212) 294-4700
11                                         JKessler@winston.com
                                           JAmoona@winston.com
12                                         AIDale@winston.com

13                                         *Attorneys for Plaintiffs*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 12, 2021                              Respectfully submitted,


By _____*/s/ Jeanifer Parsigian*_____
Jeanifer Parsigian
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 591-1000
Facsimile: (415) 591-1400
JParsigian@winston.com